Kira Dale (ISB No. 6571)
Ashton G. Ruff (ISB No. 12220)
**KIRTON MCCONKIE**
1100 W. Idaho St., Ste. 930
Boise, ID 83702
Telephone: (208) 370-3325
Facsimile: (208) 370-3324
kdale@kmclaw.com
aruff@kmclaw.com

Amir Tadjedin (OSB No. 055613) (*pro hac vice*)
Julie Engbloom (OSB No. 066988) (*pro hac vice*)
Vera Warren (OSB No. 194747) (*pro hac vice*)
**TADJEDIN THOMAS & ENGBLOOM LAW GROUP LLP**
1211 NW Glissan St., Ste. 203
Portland, OR 97209
Telephone: (503) 224-9294
Facsimile: (503) 229-0405
amirt@ttelawgroup.com
juliee@ttelawgroup.com
veraw@ttelawgroup.com

*Attorneys for Defendants Osaic Wealth, Inc. and Family Tree Financial LLC*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| FIRST TECHNOLOGY FEDERAL CREDIT UNION,<br><br>Plaintiff,<br><br>v.<br><br>LPL FINANCIAL, LLC; OSAIC WEALTH, INC.; ALFRED "JACK" JACKSON; SAGE KENDALL; KRISTINA HERNANDEZ; FAMILY TREE FINANCIAL LLC; and JACKSON HOLDINGS, LLC,<br><br>Defendants. | Case No. 1:25-cv-00582-BLW<br><br>**DEFENDANTS OSAIC WEALTH, INC. AND FAMILY TREE FINANCIAL LLC'S RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND TO SET LATER HEARING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [Dkt. 3]** |

Defendants Osaic Wealth, Inc. ("Osaic") and Family Tree Financial, LLC ("Family Tree") (collectively, "Defendants") submit this Opposition to the Motion for Temporary Restraining Order

and to Set Later Hearing on Plaintiff's Motion for Preliminary Injunction [Dkt. 3] (the "Motion"). For the reasons stated below, Defendants respectfully request the Court deny the Motion in full because neither a TRO nor a preliminary injunction is warranted.

## I. INTRODUCTION

What Plaintiff's Motion lacks in merit it makes up for in pure gumption. This lawsuit and corresponding Motion constitute an effort by Plaintiff First Technology Federal Credit Union ("First Tech" or "Plaintiff") to circumvent applicable rules governing U.S. broker-dealers and their registered agents set by the Financial Industry Regulatory Authority ("FINRA"). Plaintiff instead appeals directly to this Court, on an emergency basis, to achieve sweeping injunctive relief and discovery that it is otherwise not entitled to—all with the aim of suppressing legitimate competition and interfering with the contractual rights of individual investors.

### A. The Distinction between First Tech and Raymond James.

First Tech is a credit union, not a broker-dealer. *See* Complaint for Injunctive Relief, filed Oct. 16, 2025, Dkt. 1, ¶ 22. Therefore, it cannot offer brokerage or financial advisory services directly to its clients because it is not qualified or registered to do so. *Id.* To earn revenue from such activities, First Tech partners with Financial Institutions Division of Raymond James Financial Services, Inc. and Raymond James Financial Services Advisors, Inc. (collectively referred to herein as "Raymond James"). *Id.*

Raymond James is a broker-dealer, registered with FINRA and the Securities Exchange Commission ("SEC"). *Id.* Raymond James provides the investment services at issue and, in exchange for referring its members to Raymond James, First Tech receives a share of the revenue generated from the resulting investment accounts. *Id.*; *see also* Compl., Ex. 5, ¶ 7.

The work performed under this arrangement was carried out by Raymond James' registered representatives, including Defendants Alfred "Jack" Jackson, Kirstina Hernandez, and Sage Kendall

("Individual Defendants"), who served their investment clients through Raymond James. Their securities registrations were held by Raymond James and all their securities and investment advice was transacted through Raymond James. *Id.* at ¶ 22.

Osaic ,[1] like Raymond James, is a broker-dealer, registered with FINRA and the SEC. *Id.* at ¶¶ 7-8. When the Individual Defendants left Raymond James (and First Tech), they informed their customers, and those customers decided independently whether to keep their investments with Raymond James or move those investments to their individual financial advisors' new firms. Investment customers do not belong to any firm—it is their right to choose where and with whom they conduct their financial business. Indeed, FINRA expressly ***requires*** brokerage firms, like Defendants and Raymond James, to facilitate investors' freedom to transfer their accounts and to make informed choices about where to maintain their investments. *See* FINRA Rule 2140. It is therefore unsurprising—and not evidence of wrongdoing—that the clients who had long-standing relationships with the Individual Defendants elected to follow them to their new firms.

The distinction between First Tech and Raymond James, both in their regulatory status and in their respective roles, is critical to the allegations raised in the TRO and Complaint. First Tech is not a competitor of Defendants; it is a credit union. First Tech provides banking services, such as checking and savings accounts, certificates of deposits, and mortgages. *See* Compl. ¶ 22. First Tech cannot hold its credit union members, who are also investment customers of a separate, registered entity, hostage to its private referral arrangement with Raymond James. If any entity could plausibly claim injury from the movement of investment accounts, it would be Raymond James. Yet Raymond James has made no such claim and is conspicuously absent from this case. And First Tech, in its

[1] Family Tree is the designation for Osaic's branch office in Boise Idaho. *See* Declaration of Gregory Curley ("Curley Decl."), ¶ 2 (filed concurrently herewith).

stead, is trying to do what Raymond James cannot: circumvent the Protocol for Brokerage Recruiting ("Broker Protocol"). *Id.* at Ex. 10.

**B. The Broker Protocol**

The Broker Protocol ensures that clients and their financial advisors may freely decide where to maintain their accounts. *Id.* It also expressly allows financial advisors to access customer lists and customer contact information when departing from one brokerage firm to another. *Id.* Allowing departing financial professionals continued access to their investment clients' contact information, in turn, serves the best interests of investors as the financial professionals—here, the Individual Defendants—have longstanding relationships with investors and know their clients' unique financial circumstances, objectives, goals, and risk tolerances. Preventing investors from continuing those relationships when financial advisors change firms would disserve investors and undermine the fiduciary duties that govern investment advice.

First Tech is not a signatory to the Broker Protocol. *Id.* at ¶ 38. However, that does not mean the Broker Protocol does not apply. First Tech cannot, on the one hand, rely on its referral arrangement with Raymond James to profit from brokerage activity, and on the other, unilaterally disavow the Broker Protocol that Raymond James agreed to follow.

The clients' investment relationships at issue in this case are solely and completely with the Individual Defendants, not with First Tech. Those financial professionals have always taken off their First Tech "hat" and put on their Raymond James "hat" when conducting securities business.

First Tech is using this lawsuit to obstruct nonparty clients (its credit union members) from maintaining relationships with their chosen financial advisors. The reason for this is simple: to preserve First Tech's cut from a *referral* arrangement with Raymond James. First Tech itself is incapable of providing the investment services these clients want—it cannot recommend investments, prepare financial plans, or execute securities trades.

### C. The Motion for TRO

First Tech's request for extraordinary preliminary relief fails because it cannot carry the high burden of persuasion necessary to obtain such a drastic remedy. As discussed more fully below, to succeed on its Motion, First Tech must demonstrate (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm absent relief; (3) that the balance of equities tips in its favor; and (4) that an injunction serves the public interest. First Tech cannot meet any of these requirements.

First, Plaintiff's Motion rests on a false premise. It seeks to obstruct its members' ability to follow their chosen financial advisors to preserve its share of referral revenue from Raymond James. The documents it cites as stolen—transfer forms, customer forms, and account statements—are Raymond James' records, not its own. Although First Tech repeatedly refers to $205 million in "pilfered" client assets, it conveniently omits that those assets were never in its custody or control. They were held with Raymond James. The Motion therefore rests on a misleading characterization of the limited role the credit union played in these brokerage relationships.

Additionally, the alleged trade secrets are brokerage client lists. These are individuals, families, and businesses entitled to choose with whom they entrust their financial affairs. Plaintiff's ritualistic invocations of the words "stolen list" are not evidence and do not confer trade secret designations on client relationships.

Second, First Tech cannot show irreparable harm. The damages it seeks are entirely compensable. Moreover, First Tech concedes this lawsuit is a secondary forum. In the Complaint, it acknowledges that all relevant disputes are required to be arbitrated before FINRA, and that this action is merely a back-up in case any named Defendants are not subject to arbitration. *See* Compl. ¶¶ 13–14. First Tech's admission that it has already filed a Statement of Claim with FINRA in which it seeks monetary damages for the very conduct alleged here defeats any claim of irreparable injury and belies its claimed need for emergency relief from this Court.

Third, the relief First Tech requests is extraordinarily overreaching. It asks this Court to bar Defendants from accepting as clients anyone who ever participated in the First Tech-Raymond James referral program. Such a sweeping injunction would not preserve the status quo; it would upend it. The result would be punitive, not protective—inflicting harm on both the clients, who would be denied their chosen advisors, and the financial professionals, whose livelihoods depend on those relationships. Any alleged harm to a large credit union claiming belated "ownership" over securities clients with whom it never had direct privity pales in comparison.

Moreover, it is contrary to public policy to allow employment contracts to serve as permanent shackles for employees—or as restraints on third-party clients. This case is about nothing more than an attempt to require all departing brokers to pay for their books of business when they leave. That is not a legitimate use of injunctive relief; it is an exit tax.

Finally, First Tech's pretrial behavior contradicts its conjured need for emergency relief from this Court. Prior to the initiation of this lawsuit, Defendants took significant steps to maintain the status quo and to address First Tech's concerns in good faith. They agreed to return information, suspend use of disputed materials, and negotiate forensic protocols. In every discussion, however, First Tech moved the goal posts. It is now clear that these conferrals were performative. Every email sent by First Tech's counsel was accompanied by artificial deadlines ("must respond by 3:00 pm"; "immediately respond by 'COB'"). The exchanges were never intended to resolve a dispute; they were designed to manufacture a record of apparent urgency to justify this baseless Motion and an improper request for discovery with hopes it might uncover wrongdoing that does not exist.

## II. FACTUAL DISCUSSION

### A. Mr. Kendall's Resignation and Lawful Transition Under the Broker Protocol.

Defendant, Sage Kendall, was formerly a Raymond James-registered professional financial advisor who worked at a First Tech branch pursuant to its referral program with Raymond James.

*See* Declaration of Sage Kendall ("Kendall Decl."), ¶ 1, filed Oct. 24, 2025, Dkt. 32-2. On September 9, 2025, Mr. Kendall resigned from his position with First Tech and Raymond James via written notice and transitioned his investment advising business to Defendants. *See* Compl. ¶ 15. His resignation and client transition were conducted pursuant to the Broker Protocol, an agreement among hundreds of FINRA-member firms, including Raymond James and Osaic. *See* Compl. ¶¶ 17, 35-40, Ex. 10.

The Broker Protocol provides that when a registered representative moves from one member firm to another, both firms agree to allow the departing representative to take five pieces of client information with them: client names, phone numbers, addresses, email addresses, and account titles. *See id.* The Broker Protocol ensures that clients remain free to decide with whom they wish to maintain their investment relationships and that advisors can continue servicing those clients without disruption. *See id.*

Upon resignation, Mr. Kendall invoked the Broker Protocol and retained a list containing only those five data fields for clients he serviced at Raymond James. Kendall Decl., ¶¶ 1-2. Following his resignation, Mr. Kendall contacted his clients to inform them of his departure from First Tech and Raymond James via email. *See* Compl. ¶ 47, Ex. 23. This was expressly permitted under the Broker Protocol. Indeed, the client communications that followed were standard industry transition notices informing investors of Mr. Kendall's new contact information and allowing the investors to decide whether they wished to continue working with him. *See id.*

At all times, Mr. Kendall acted in good faith and in accordance with both his regulatory obligations and Raymond James's procedures. No confidential First Tech information was "stolen," nor was any proprietary data transferred. The *investment* clients in question were Raymond James clients—not First Tech clients—and their investment accounts were custodied and serviced through Raymond James, a signatory to the Broker Protocol. *See* Compl. ¶ 39.

**B. First Tech's Pre-Litigation Communications and Defendants' Good-Faith Efforts to Cooperate.**

Immediately after Mr. Kendall's resignation, counsel for First Tech began sending letters alleging "theft" of confidential information and demanding extraordinary remedial measures. On September 11, 2025, First Tech's counsel, Niel Prosser, issued a Cease and Desist Letter to Mr. Kendall, and representatives of Defendants. *See* Compl., Ex. 40; *see also* Curley Decl., ¶ 2, Ex. 1, pp. 8–9. The letter accused them of stealing confidential materials and demanded that Mr. Kendall cease all communications with clients, return all purported "trade secrets," and submit his electronic devices for forensic imaging—all within twenty-four hours. *See id.* The following day, Mr. Prosser forwarded the letter to Greg Curley, Osaic's in-house counsel, and demanded a response to the letter by 3 pm the next business day. *Id.* at ¶ 4, Ex. 1, pp. 7–8.

Mr. Prosser's demands persisted. On September 23, 2025, he emailed Mr. Curley, insisting that Defendants investigate Mr. Kendall's conduct and "purge" allegedly "stolen" materials. *Id.* at ¶ 5, Ex. 1, pp. 6–7. He further demanded a "full accounting" of Defendants' internal investigation. *Id.* Mr. Curley responded the same day explaining Defendants had implemented measures addressing the concerns raised in the cease-and-desist letter. *Id.* at ¶ 6, Ex. 1, p. 5.

Undeterred and all while acknowledging that Mr. Kendall confirmed that he would not use any of the client information he took with him pursuant to the Broker Protocol, on September 24, 2025, Mr. Prosser demanded a detailed description of Defendants' sequestration methods by the next day. *Id.* at ¶ 7, Ex. 1, pp. 3–4. The following day, Mr. Prosser again pressed Defendants to accept his proposed sequestration terms and insisted on a response by "COB"—even after acknowledging Mr. Curley's "out of office" notice. *Id.* at ¶ 8, Ex. 1, pp. 2–3.

In response, Mr. Curley outlined the measures in place addressing Mr. Prosser's concerns, such as purchasing new equipment that never had First Tech documents or data and engaging a

forensic expert to perform imaging. *Id.* at ¶ 9, Ex. 1, p. 2. Mr. Prosser never replied and made no further attempt to resolve the dispute with Defendants before filing suit. *Id.* at ¶ 10, Ex. 2, p. 9.

Throughout this time, Defendants cooperated with First Tech in good faith. The computers containing the alleged "client lists" were properly sequestered, no documents were altered, and no evidence was spoliated. *Id.* at ¶ 11. That investment clients may have, thereafter, moved their investment accounts neither establishes on-going contact or use of the information to which First Tech objects.

### C. The FINRA Arbitration and Duplicative Proceedings

First Tech has already filed a Statement of Claim before FINRA, seeking monetary damages and permanent injunctive relief for the same alleged conduct underlying this action. *See* Compl. ¶¶ 13–14. It acknowledges in its own Complaint that all Defendants are subject to mandatory arbitration before FINRA and that this federal case is merely a back-up proceeding in the event any defendant is not ultimately subject to arbitration. *See id.*

## III. LEGAL STANDARD

"[T]he legal standards applicable to TROs and preliminary injunctions are substantially identical." *Washington v. Trump*, 847 F.3d 1151, 1159, n.3 (9th Cir. 2017) (internal citations omitted). Both require the plaintiff to establish: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors the plaintiff, and (4) that an injunction is in the public interest." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

A "preliminary injunction is an extraordinary and drastic remedy" that "should never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation omitted). Therefore, a court may only grant such relief "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. In addition, the Court must pay particular regard for the public

consequences of an injunction. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017).

## IV. ARGUMENT

First Tech cannot meet any of these prongs. First, Plaintiff is unlikely to succeed on the merits of any of its claims against Defendants; it cannot keep Raymond James-affiliated financial professionals from contacting their own customers. Second, it cannot demonstrate irreparable harm as the losses it alleges are economic, calculable, and compensable. Third, the sweeping relief sought tips the equities wildly out of First Tech's favor and unreasonably restricts third parties, the investment clients, against the public interest and clearly-established FINRA policy.

### A. Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits.

Plaintiff asserts three claims against Defendants: (1) misappropriation of trade secrets under federal and state statute, (2) tortious interference with contract, and (3) tortious interference with prospective economic advantage. *See generally* Compl. All are based on allegations that Mr. Kendall: obtained client lists from First Tech, informed those clients that he was now working for Family Tree, and some of those clients subsequently transferred their accounts.

Plaintiff cannot succeed on any of these claims, because it cannot show Defendants acted wrongfully. All customer-related information belongs to Raymond James, a member of the Broker Protocol. Moreover, First Tech has no factual support for the claims against Defendants. Instead, First Tech conflates the conduct of all Defendants and relies on conclusory statements, speculation, and guesswork. This is not a sufficient foundation for the extraordinary and drastic relief it seeks.

1. <u>Plaintiff Cannot Succeed on a Misappropriation of Trade Secrets Claim against Defendants.</u>

To prevail on a claim brought under either the Idaho Trade Secrets Act ("ITSA") or the Defend Trade Secret Act ("DTSA"), Plaintiff must show: (1) a trade secret actually existed; (2) the defendant misappropriated the trade secret; and (3) the defendant's conduct damaged the plaintiff.

*See Trumble v. Farm Bureau Mut. Ins. Co.*, 166 Idaho 132, 148–49, 456 P.3d 201, 217–18 (2019); *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020); *see also* 18 U.S.C. §§ 1836(b)(1), 1839(3)-(5).

A trade secret is defined as "information" that "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." I.C. § 48-801(5)(a). A trade secret must also be "subject of efforts that are reasonable under the circumstances to maintain its secrecy." I.C. § 48-801(5)(b). Misappropriation, in this context, means "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by **improper means**." I.C. § 48-801(2)(a) (emphasis added).

Plaintiff's trade secret misappropriation claims fail for three essential reasons: (1) the brokerage client lists do not constitute "trade secrets," (2) the brokerage client lists do not belong to Plaintiff; and (3) the brokerage client lists were not obtained through wrongful means.

First, the Individual Defendants have presented opposition papers persuasively refuting any claims that client identities and contact information are "trade secrets." *See* Individual Defendants Memo. In Opp'n to Mot. for TRO ("Individual Defs.' Opp'n"), filed October 24, 2025, Dkt. 32, at pp. 15–16. Defendants join in those arguments. As to any additional argument premised on information other than customer lists, such as investment holdings, such information would obviously be known to the customers and cannot be considered trade secrets either. *Hilb Grp. of New York, LLC v. Associated Agencies, Inc.*, 2023 WL 5979184, at *4 (E.D.N.Y. July 18, 2023) (investment information not secret when known to investment-customers).

Second, the alleged trade secrets at issue are *investment* client lists that belong to Raymond James. The *investment* clients have no direct privity with First Tech as to *securities* transactions. Plaintiff concedes it offers these services through Raymond James. Mot. at 12, n.12. First Tech also

concedes that it "transferred technical ownership of certain customer information related to the joint securities customers to [Raymond James]." *Id.* at 12.

This is also consistent with the Financial Advisor Agreement ("FA Agreement) between First Tech, Mr. Kendall, and Raymond James. *See* Compl., Ex. 2. The FA Agreement clearly states that "any customer-related information provided to Financial Advisor or about which Financial Advisor may become aware during the term of this Agreement is proprietary information of [Raymond James]." *Id.* at ¶ 20. And Raymond James is a signatory to the Broker Protocol. Compl. ¶ 39.

First Tech argues that it has a right to the securities client lists as a "licensee" pursuant to the "NDIP Agreement." Mot. at 12–13. However, the NDIP Agreement does not support this claim. *See* Compl., Ex. 9. The NDIP Agreement allows First Tech and Raymond James to share certain information about the clients First Tech referred to Raymond James. *Id.* This does not provide First Tech with an independent right to claim the investment client lists as its own, protectable "trade secrets." First Tech is not even in the "trade" of providing brokerage services. Further, Mr. Kendall accessed this information through Raymond James' accounts. Kendall Decl., ¶ 2.

Third, First Tech cannot show misappropriation, because the brokerage client lists were obtained lawfully and consistent with the Broker Protocol. First Tech is not a signatory to that protocol. However, Raymond James, the actual entity providing brokerage services consistent with FINRA and SEC standards, is. Compl. ¶ 39. Thus, Defendants reasonably relied on that Protocol in good faith.

The "principal goal" of the Broker Protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms. *See* Compl., Ex. 10. Under the Broker Protocol, the Individual Defendants are allowed to solicit clients from their former firms. *Id.* ("RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined

their new firms.") More specifically, the Individual Defendants, as departing team members, "may take the Client Information for all clients serviced by the team . . . and may solicit those clients to move their accounts to the new firm without fear of litigation from the RR's former firm." *Id.*

The Broker Protocol establishes a consensus for how brokerage firms generally treat broker transitions. It reflects that the securities industry is fluid: brokers leave and join firms and their clients are permitted to follow. This typically does not result in litigation nor should it here. *See Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 274–75 (4th Cir. 2025) (the Broker Protocol "contemplates liability when an outside firm preys upon another firm, not when individuals leave a firm.")

First Tech has not, and cannot, allege that Defendants preyed upon it. Similarly, there is no evidence of a scheme, a conspiracy, or anything of the sort between the individual and institutional Defendants. In fact, one broker went to LPL, and the other to Defendants—and LPL and Defendants are competitors. These facts alone cast doubt on the fictional conspiracy claims.

Rather than engage in any wrongful behavior, Defendants complied with FINRA rules and accepted the brokerage clients' choices.

> No member or person associated with a member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative where the account is not subject to any lien for monies owed by the customer or other bona fide claim. <u>Prohibited interference includes, but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery or acceptance of a written request from a customer to transfer his or her account.</u>

FINRA Rule 2140 (emphasis added).

The bottom line is there has been no misappropriation. The Individual Defendants left First Tech; they invoked the Broker Protocol and told their investment clients about their change in affiliation. Those investment clients had the independent choice to move their investment accounts from Raymond James to Defendants. This has nothing to do with First Tech's credit union customer base or business. Defendants did nothing more than honor the investment clients' choices as required.

Other courts have expressly held that sending an announcement of a change of employers does not constitute misappropriation of trade secrets or impermissible solicitation. *Citigroup Glob. Markets, Inc. v. Crum*, 2005 WL 8162413, at *3 (N.D. Cal. Feb. 28, 2005) ("merely informing former customers of a change in employment cannot constitute a misappropriation of trade secrets or impermissible solicitation."); *see also Miles, Inc. v. Scripps Clinic & Rsch. Found.*, 810 F. Supp. 1091, 1094 (S.D. Cal. 1993) ("there can be no conversion of the goodwill of a business, trade secrets, a newspaper route, or a laundry list of customers.").

In short, Plaintiff is unlikely to succeed on its claim for misappropriation of trade secrets.

2. Similarly, Plaintiff Cannot Show Intentional Interference with Contract or Prospective Economic Advantage.

"[T]he torts of intentional interference with prospective economic advantage and intentional interference with contract are similar" and "cases and commentary addressing the two torts often apply interchangeably for proving the common elements." *Cantwell v. City of Boise*, 146 Idaho 127, 138 n. 5, 191 P.3d 205, 216 n. 5 (2008). Intentional interference with contract requires that the defendant intentionally interfere with a contract, causing its breach. *See Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 895, 243 P.3d 1069, 1083 (2010).

Establishing intentional interference with prospective economic advantage requires an even higher standard. Plaintiff must show "the interference was wrongful by some measure beyond the fact of the interference itself." *Id.* at 893, 243 P.3d at 1081. This requires "proof that either: (1) the defendant had an improper objective or purpose to harm the plaintiff, or (2) the defendant used a wrongful means to cause injury to the prospective business relationship." *Id.* (internal citations omitted).

For the same reasons the misappropriation of trade secrets claim fails, so too, do the tort claims. There is simply no record to support a finding that Osaic and Family Tree intentionally

interfered with the contracts at issue. Rather, the evidence reflects these Defendants acted consistent with FINRA rules and honored the investors' individual choices.

3. First Tech's Arguments in Support of these Claims are Conclusory, Speculative, and Illogical.

First Tech offers no real proof in support of the claims against Defendants. First Tech alleges: (1) the conduct giving rise to the Complaint was the result of a months-long conspiracy between the Individual Defendants "and with their soon-to-be new firms" (Compl. ¶ 15); (2) Osaic "knowingly allowed [its] new hire[] to take and use a complete customer list" (*Id.* at ¶ 41); and (3) a mass email sent to the Individual Defendants' customers was sent "with the advance approval of both Osaic and Family Tree." *Id*. at ¶ 47.C. There is not a shred of evidence in the record to support these allegations. And they ignore that Osaic and LPL are direct competitors.

In support of the misappropriation of trade secrets claim specifically, First Tech alleges that Defendants "directed, aided, abetted and/or ratified" Mr. Kendall's conduct and were "on notice of the misappropriation . . . when they received the Cease and Desist letters..." *Id.* at ¶ 69. Plaintiff sent the cease-and-desist letter ***after*** Mr. Kendall resigned, invoked the Broker Protocol, switched affiliations, and sent the emails at issue. *See id.* Manufactured knowledge after the fact cannot support the claim.

Similarly, in support of the tortious interference with contract claim, First Tech relies on information it sent to Defendants on September 11 and 12, 2025 to argue "there is no doubt that the firm Defendants . . . had actual knowledge of the First Tech contracts at issue" and "intentionally caused the Ex-Employees to breach those agreements." *Id.* at ¶¶ 95–96. At the same time, First Tech argues that the agreements were breached when Mr. Kendall resigned on September 9, 2025; immediately affiliated with Defendants; and sent an email to all of his former investor clients "[b]y the time the markets opened the next day." *Id.* at ¶¶ 15-16. Thus, the breaches occurred before First Tech sent the information it claims establishes knowledge.

**B. Plaintiff Cannot Establish Irreparable Harm.**

The allegations in the Complaint and Motion belie any claim of irreparable harm. Instead, they quantify alleged economic damages that are entirely calculable and compensable.

"Courts have become disinclined to find irreparable, incalculable harm from financial advisors' departures." *Barney v. Burrow*, 558 F. Supp. 2d 1066, 1083 (E.D. Cal. 2008). Rather, previous employers may seek compensation for proven economic harm resulting from the departure and subsequent conduct. *See id.*; *see also Morgan Stanley Smith Barney LLC v. Sayler* 2019 WL 3459237, at *5 (D. Or. July 31, 2019) (declining to issue preliminary injunction against financial professionals leaving firm because "[s]uch harms can be redressed by damages…and are not, therefore, irreparable.").

Plaintiff has already calculated, to the dollar, the revenue it claims to have lost. *See* Compl. ¶ 16 ("In total First Tech has already lost over **$205,000,000 in assets** and more **than $1,1000,000 in recurring annual revenue** because of the Defendants' misconduct."); Mot. at 2 ("at the same time the Kendall/Osaic Defendants have transferred some 21% of the $249 million assets for the clients on his stolen client list (i.e., some $54 million)…"). Indeed, as of the date of Mr. Poole's declaration, First Tech had calculated its losses by date, number of clients, assets under management, and resulting lost revenue. *See* Compl., Ex. 5, ¶ 23.

Defendants do not concede the accuracy of these numbers or that they constitute lost revenue. However, the allegations reflect that the claimed harm is measurable. Once the details of the referral arrangement with Raymond James are established, First Tech can readily determine any revenue it might have earned from the clients who chose to follow their long-time advisors to new firms.

Moreover, First Tech has already filed a Statement of Claim in FINRA arbitration, and that arbitration panel could very well determine the damages (if any) that First Tech suffered from clients leaving a referral arrangement for other firms.

Courts addressing nearly identical disputes have uniformly rejected claims of irreparable harm in this context. In *Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1376 (N.D. Ga. 2001), the court held:

> Morgan Stanley cannot demonstrate irreparable harm because any injury it may suffer due to actions allegedly taken by Defendants is compensable by the award of money damages. The United States Supreme Court has stated that the mere loss of income, no matter how great, does not constitute irreparable harm:
>
> [I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury...The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.
>
> The securities industry is highly regulated. Each individual transaction is monitored electronically. Every customer transfer from Morgan Stanley is documented. Every executed trade is recorded. Every dollar earned in fees by Defendants Frisby and Lovell doing business with those customers that Morgan Stanley considers its own can be traced precisely. Any loss Morgan Stanley might suffer as a result of Defendants' departure is calculable.

(citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). The same is true here. The temporary redirection of revenue through clients' voluntary account transfers is not irreparable—it is both quantifiable and compensable. Thus, Plaintiff cannot show irreparable harm.

**C. The Equities and Public Interest Weigh Against Injunctive Relief.**

Plaintiff seeks sweeping injunctive relief, asking the Court to bar Defendants "from accepting any business—including the transfer of any client account" previously serviced by Mr. Kendall for any transfer request received on or after the date of this lawsuit. Mot. at 19.

The balance of equities weighs heavily against such relief, as it would significantly impact the Individual Defendants' ability to continue providing investment advice to clients they have known and serviced for years. It effectively ends their careers or forces them to start over. The resulting harm to them and to their clients far outweighs any harm to First Tech, who never held the client accounts at issue and had no direct privity with those investors vis-à-vis their investment accounts.

In addition, such relief is clearly against the public interest and imposes costs on non-parties to this litigation. The public interest favors allowing investors to choose where they keep their assets. As the court in *Frisby* aptly observed, "[t]he public has little interest in having its choice restricted to brokers *other* than the one who has served them, pending the resolution of this dispute." *Frisby*, 163 F. Supp. 2d at 1382. "In a time of market volatility, the inability of a client to consult a trusted advisor for even a single day could result in enormous financial losses to the client." *Id.* Such a danger outweighs any alleged injury that First Tech may have incurred resulting from the claimed disloyalty of its former employees. *See id.*

### D. Plaintiff's Allegations against Defendants Fail to Demonstrate the "Clear Showing" Required for Injunctive Relief.

First Tech's evidentiary showing falls far short of the "clear showing" required for the extraordinary remedy of injunctive relief. *See Winter*, 555 U.S. at 22. The record is devoid of credible evidence for wrongful conduct, particularly as to Defendants. What remains are conclusory assertions, speculation, and conjecture, none of which can satisfy Plaintiff's burden.

First, First Tech offers "proof" of Osaic's size. This is irrelevant. The mere status as large and growing company is hardly evidence of a wrongful scheme or wrongdoing of any kind.

Second, averments based on "information and belief" that Osaic offered enticements for Mr. Kendall to join are conjecture; and again, irrelevant. It's very likely that First Tech similarly competes with other credit unions for credit union clients and similarly offers benefits to prospective employees as part of its recruitment efforts. That is lawful competition.

Third, the declarations submitted by First Tech employees lack any indicia of reliability. These declarations are riddled with legal conclusions by non-lawyers who characterize information as "pilfered" or "stolen" by the Individual Defendants. These individuals offer no proof, no evidence, or even inference of any wrongful conduct by Osaic or Family Tree. For example, declarants offer self serving statements like the following:

> "In my opinion, this Mail Email is a clear effort to solicit, divert, and/or take his former first Tech clients' business to his new employer (Osaic/Family Tree) in violation of his Agreement with First Tech." *Id.* at ¶ 22.

> "If Mr. Jackson or Mr. Kendall had asked me—as their supervisor—if First Tech was ever a member of the Protocol, I would have unequivocally told them no. None of them, however, ever asked me." Compl., Ex. 17, ¶ 4.

If anything, this testimony supports an inference that the Individual Defendants acted in good faith and had no reason to believe that First Tech would claim that the Broker Protocol did not apply.

Fourth, Plaintiff offers no evidence to support a conclusion that either Osaic or Family Tree engaged in any wrongful conduct. Its allegation that they "conspired" "for months" with the Individual Defendants is wholly unsupported. Defendants are obligated to facilitate the transfer of client accounts if clients so choose. Fulfilling those obligations is not evidence of misconduct; it is evidence of compliance with industry practice and applicable rules.

Plaintiff's suggestion that Defendants refused to admit that financial data was "stolen" also misunderstands the nature of litigation. Defendants have not admitted wrongdoing because none has occurred. There is no "stolen" data, no "trade secrets," and no evidence of misappropriation.

### E. There is No Urgency as Required to Issue the Drastic Remedy of a TRO.

The record makes clear that any alleged "emergency" has been manufactured by First Tech to create the illusion of crisis where none exists. The full recitation of the significant attempts made to address these issues is set forth in in the Individual Defendants' Oppositions and will not be repeated here. Those undisputed facts establish that the Individual Defendants and their counsel attempted to address *every* concern that First Tech now claims it needs Court intervention to address.

The ultimate obstacle to those resolutions was the Individual Defendants' refusal to allow Plaintiff's counsel from seizing devices and repositories and having unfettered control over those devices and information contained on those devices—including information that is highly sensitive,

private, potentially privileged, and which has no nexus to anything in this case. No competent counsel should be expected to accept such demands—and none did.

Contrary to First Tech's accusations, Defendants did not ignore First Tech's concerns. To the contrary, Defendants promptly:

- Notified First Tech that the devices containing the allegedly "stolen material" would be returned to the individual Defendants' counsel;
- Directed Mr. Kendall and a Family Tree associate to return those devices without making any alterations or deletions;
- Purchased, at its own expense, new laptops for Mr. Kendall and his associate to ensure that no potentially disputed data would reside on devices used in ongoing business;
- Agreed to the retention of a neutral forensic examiner to analyze the returned devices; and
- Proposed that reasonable search terms be used to identify responsive information, subject to counsel's ability to object to irrelevant or personal material.

*See* Curley Decl. ¶¶ 6, 9, & 11–13.

Consistent with its intent to manufacture disputes, First Tech rebuffed these proposals as insufficient and woefully inadequate. And when a counsel call was scheduled, First Tech counsel, Mr. Prosser, unilaterally cancelled it and apparently spent the next ten days preparing its Complaint instead. The reality is that there is nothing exigent mandating the entry of a TRO. This is a manufactured dispute, the purpose of which is to obtain discovery not available in FINRA.

Finally, evidence that clients continue to transfer their investment accounts to Defendants is not proof of on-going "solicitation." Rather, it reflects the reality that it sometimes takes time for customers to decide what to do and ultimately transfer their accounts to a new brokerage firm.

## V. CONCLUSION

WHEREFORE Defendants Osaic Wealth, Inc. and Family Tree Financial, LLC pray that this Court deny the Motion.

DATED this 27th day of October, 2025.

**KIRTON MCCONKIE**

*/s/ Kira Dale*
Kira Dale

**TTE LAW GROUP LLP**

*/s/ Amir Tadjedin*
Amir Tadjedin
Julie Engbloom
Vera Warren

*Attorneys for Defendants Osaic Wealth, Inc. and Family Tree Financial LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of October, 2025, I electronically filed the foregoing document through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

- **Alexander Rudman Bunn**
  abunn@prosserlaw.com

- **Julie M Engbloom**
  juliee@ttelawgroup.com

- **Nicole C Hancock**
  nicole.hancock@stoel.com, gina.wyner@stoel.com, maren.armbrust@stoel.com, docketclerk@stoel.com, julie.deshaw@stoel.com, hillary.bibb@stoel.com, tracy.horan@stoel.com, emina.hasanovic@stoel.com, karissa.armbrust@stoel.com

- **Anne Henderson Haws**
  aehenderson@hollandhart.com, intaketeam@hollandhart.com, cmcarvalho@hollandhart.com

- **Kyle Daniel Johnson**
  kjohnson@prosserlaw.com, tberry@prosserlaw.com, abunn@prosserlaw.com, np@prosserlaw.com

- **Alexander P. McLaughlin**
  alexmclaughlin@givenspursley.com, stacywardein@givenspursley.com, tmh@givenspursley.com

- **Bradley R. Prowant**
  bradley.prowant@stoel.com, docketclerk@stoel.com, christina.hartman@stoel.com

- **Robert Blaine White**
  rbw@givenspursley.com, kendrah@givenspursley.com, mhw@givenspursley.com

and any others as listed on the Court's ECF Notice.

*/s/ Kira Dale*
Kira Dale